COCHRAN *v.* COCHRAN.

857

No. 8635.  DECEMBER 16, 1931.

J. A. McFarland, H. H. Anderson, and W. B. Robinson, for plaintiff in error.

J. M. Neel, contra.

GILBERT, J.  On March 2, 1931, A. T. Cochran left his home in Murray County, where he had resided for many years, stating that he was going to Chattanooga to buy goods for the general mercantile and supply business of Cochran & Tatum, a partnership in which he owned a half interest.  Besides his interest in the partnership he owned a warehouse, a number of houses and farms which were being rented, the aggregate value being alleged as $40,000.  Upon his failure to return, Mrs. Cochran presented to the judge of the superior court, on March 13, 1931, a petition alleging that before leaving his home Cochran had left notes for delivery after his departure, which rendered it uncertain whether he would ever return to Murray County, but that his legal residence was still in that county; that unless the court should through a receiver take charge of the property, Cochran would convey and encumber it for the purpose of defeating petitioner's claim for alimony; that she had no separate estate, but was wholly dependent upon her husband; that she had for several years been in bad

health; that she and the defendant had two children, a daughter 23 years old and married, and a son nineteen; and that because of the disappearance of Cochran and petitioner's inability to ascertain his whereabouts, it was questionable whether personal service could be had upon him. She sought, if personal service could be had, a recovery of temporary and permanent alimony, and, in the event personal service could not be had, temporary support and permanent alimony for herself and minor son, to be paid to her from the property of the defendant by the receiver sought by her; alleging that if personal service could be made, she would be entitled to a personal judgment against the defendant for such sum as might be awarded to her by a jury on the trial for permanent alimony; and that if personal service could not be had, she would be entitled to proceed in rem against all of the property of the defendant for the sum so awarded. The partnership of Cochran & Tatum and W. A. Tatum were made defendants in the petition, which contained prayers for appointment of a receiver to take charge of and manage the property of Cochran; for injunction to restrain Tatum from delivering to Cochran any of the profits of the partnership, and to restrain Cochran from selling or encumbering his property; and that provision for temporary and permanent alimony for petitioner be made.

Service of the petition by publication was ordered, injunction was granted as prayed, and Mrs. Cochran was appointed temporary receiver of the properties of Cochran. On July 15, 1931, Cochran was served personally in Murray County. On July 18 he filed an answer admitting that on March 2 he was a resident of Murray County, but denying that his legal residence was still in that county. He set up, against the averment of the wife that their marriage had not been dissolved and her claim for alimony, a decree of divorce procured by him in the second judicial district court of the State of Nevada, in and for Washoe County, Reno, Nevada, dated June 22, 1931, which suit was instituted on May 2, 1931, and of which Mrs. Cochran had actual notice by personal service, and opportunity to file defense. And he sought to have the order appointing receiver and granting relief in accordance with the prayers of the petition revoked; to have his property turned back to him, and an accounting of the same by the receiver. On hearing the court ordered Cochran to pay the plaintiff $100 per month

temporary alimony and $250 temporary counsel fees, and authorized the receiver, in the event of Cochran's failure to do so, to make the payments out of any funds coming into her hands as such receiver; and if she should not have sufficient funds at any time, W. A. Tatum was ordered to pay any deficit out of the interest of A. T. Cochran in the firm of Cochran & Tatum. The defendant excepted on the ground that the judgment is contrary to law. The defendant in error moved to dismiss the writ of error, because the partnership of Cochran & Tatum and W. A. Tatum, parties in the trial court, were not parties to the bill of exceptions.

■ Headnotes one, two, three, and four do not require elaboration.

■ The petitioner and the defendant were married in the year 1905 in Murray County, Georgia. For many years they resided at Chatsworth in that county, until March 2, 1931. There are two children, a married daughter and a son nineteen years of age, who at the time of the separation was attending school elsewhere. The defendant husband accumulated considerable property, estimated by the wife at approximately $40,000, consisting of a half interest in a copartnership known as Cochran & Tatum, doing a mercantile business in Chatsworth, and real estate consisting of a number of city lots and some farm lands. Late in 1930 differences arose between the husband and wife, because of attentions on the part of the husband to a young woman who was employed as a clerk in the business of Cochran & Tatum. The wife had many times protested, and the partner had also protested that such attentions were becoming noticeable and would injure the business. The defendant began secretly, without the knowledge of his partner, Tatum, paying to the young woman clerk a sum of money monthly in addition to the salary which was being paid by the firm. Finally, on March 2, 1931, the husband left his home before daylight, stating that he was going to Chattanooga, Tenn., for the purpose of purchasing goods for the mercantile firm of Cochran & Tatum. He left with the bookkeeper of the partnership, with instructions not to deliver the same for two days, notes, one to his wife and one to his son, the purport of which was to direct that the wife take no action, and that he would see that she did not suffer, and that she might collect the rents from his real estate, amounting to about $70 per month, and use them for carrying on

her household. Nothing more was known of the whereabouts of Cochran until after March 13. Notice came that he had instituted in Reno, Nevada, a suit for divorce. Subsequently he caused what he termed service of notice of the divorce suit to be made on Mrs. Cochran in Chatsworth. She did not appear personally or otherwise in the divorce proceeding. On leaving Chatsworth, March 2, 1931, he took with him the proceeds of the sale of fifty-six bales of cotton belonging to the firm of Cochran & Tatum, accounting for the same by leaving his promissory note for the amount thereof, payable to the firm. Altogether Cochran had with him, on leaving Chatsworth, approximately $3000. This money he deposited in bank in Chattanooga, Tenn., where more than one thousand dollars of it remained at the time of the hearing in this proceeding. According to Cochran's evidence, he journeyed as follows: Leaving Chattanooga March 3, he "went on to Texas and then . . to Tia Juana, Mexico, . . came on to California and on up to Nevada, and got to Reno, Nevada, on the 13th of March, 1931," and instituted the suit for divorce on May 2, 1931. On the hearing for temporary alimony Cochran testified, in regard to his sojourn in Reno, as follows: "I lived at Reno, Nevada, from about the 13th day of March, 1931, till the 8th day of July, 1931. I stayed at different hotels and tourist camps, and boarded part of the time with a lady on Sixth Street. . . I did not spend any night away from Reno, Nevada, from about the 13th of March, 1931. I didn't have any job or do anything while there, except loaf and gamble. As to why I didn't come back as soon as my divorce was granted on the 22nd day of June, 1931, I stayed on in Reno to be there for the races and fights on July 4th."

The sole ground alleged in his petition for divorce was "extreme cruelty," which, under the laws of Nevada, is made a ground for absolute divorce. Under an act approved March 13, 1931, the State of Nevada has fixed a residence of six weeks as sufficient to afford jurisdiction to the courts for the grant of divorces. On the hearing on the petition for alimony, the record of the Nevada divorce case, including the petition and decree granting the divorce, was introduced in evidence, but the record does not include any part of the evidence introduced in the Nevada court for the purpose of showing whether the decree was sufficiently supported. In the answer of Cochran he alleged, and on the hearing in this case he

swore, that his wife was guilty of cruelty towards him, based on the general charge of "nagging." The wife's evidence, supported by the son and daughter, refuted that charge, and demanded a finding that the disagreements, charges, and counter-charges all arose out of the attention of the husband to the young woman clerk above mentioned. The defendant testified, in addition to what is quoted above, as follows: "As to whether or not I saw Stella Groves [the cause of separation] on that trip, or whether she left Chattanooga with me, or was with me while I was gone, I decline to answer, because my answer might seek to incriminate me, or you might try to get a criminal case out of it; but I will tell you that nothing wrong has happened between me and that girl at any time. She is at home now. I saw her day before yesterday at her home in Murray County. I didn't tell my family where I was going, except to tell my daughter that I was going to Chattanooga that day. . . I carried about $3,000.00 in money away with me, and of this I have $1,054 on deposit in the First National Bank, Chattanooga, Tennessee. The rest I spent living and gambling."

Moreover, the evidence demands a finding that Cochran did not make any effort to close out his interest in the mercantile business in Chatsworth, but left it to be carried on by his partner until his return. Not only that, but he left, until the date of this trial, on deposit in Chattanooga, Tenn., more than $1000; and it is not supposable that, had he intended a bona fide permanent domicile in Reno, he would have left his mercantile business to be continued in Chatsworth and his more than $1000 to remain in bank at Chattanooga. The record of his success in the business world in Chatsworth is conclusive evidence that, had he intended a bona fide permanent home in Reno, he would have committed no such business folly. Had his purpose been bona fide, he would not have left his home in Chatsworth between sundown and sunrise, with the misleading statement, which was equivalent to a falsehood, that he was going to Chattanooga merely to buy goods for the mercantile firm. The fact that he had sold cotton belonging to the firm and executed a promissory note for the proceeds, and that he deposited the same in his own name in Chattanooga and not in the name of the firm, and left almost immediately for the west, shows that his statement on leaving was intended to mislead. The fact that he did go to Chattanooga, did buy some goods, does not

alter in any way the conclusion which we have reached. On the other hand, it showed an intention on his part to continue the mercantile business in Chatsworth, which he would not likely have done if he had intended to remove to Reno and to effect a domicile there. This conclusion is strengthened by the fact that his purposes were unknown to his partner, beyond his going to Chattanooga. These facts alone perhaps are sufficient to show the invalidity of the Nevada divorce decree. There are other reasons which, due to the importance of the question, should be mentioned, and which perhaps are more fundamental in character.

The divorce decree is void. That conclusion is fortified by the adjudications of the Supreme Court of Nevada, with reference to the divorce laws of that State. In Fleming v. Fleming, 36 Nev. 135-141 (134 Pac. 445), decided when the period of residence required was six months, it was held that actual living in the county by plaintiff for the six months was necessary to give jurisdiction to the court. "Reside," the court says, "means permanency as well as continuity. Actual residence is the place of actual abode; of physical presence—the abiding place. Legal residence may be ideal, but actual residence must be substantial. Where residence is made the basis of adjudication, parties who seek to invoke the power of the court to relieve them from the marriage tie must bring themselves clearly and affirmatively within the jurisdiction of the court." Again, the Supreme Court of Nevada declared that residence required by the statutes of that State for divorce purposes is residence of the character denoting present intention on the part of one claiming to make the county in which the suit is instituted such person's home, at least for an indefinite period. Latterner v. Latterner, 51 Nev. 285 (274 Pac. 194). In Walker v. Walker, 45 Nev. 105 (198 Pac. 433), the court declared that residence in the State for the statutory period solely for the purpose of obtaining a divorce is not sufficient to give jurisdiction, but a *bona fide residence* with the intention of remaining must appear, and plaintiffs must bring themselves clearly and affirmatively within the jurisdiction of the court. And again, in Barber v. Barber, 47 Nev. 377 (39 A. L. R. 706, 22 Pac. 284), the Supreme Court of Nevada stated the sound rule that "domicile within Nevada" of one of the parties is essential to the power of the courts of that State to dissolve the marital bonds. Under these decisions, which do not substantially differ from

the principles declared in the great majority of American States, what validity can be attached to the divorce decree obtained by Cochran and found in the record in the present case? The evidence produced in this, the alimony case, including his own statements, has been stated above. It is inconceivable that one motivated by the reasons and the influences indicated in this record would, either in a Nevada court or in the courts of Murray County, give evidence less favorable to himself than the actual facts authorized. Upon the contrary, judging him by every rule applicable to mankind, viewed in the light shed by the evidence upon his acts and conduct and by the universal rule of law, his evidence as stated by himself must be construed most strongly against him. Thus construed, the evidence not only authorized the trial judge to find that Cochran was never a bona fide resident of Reno, Nev., never intended to establish a domicile there, never intended to do more than get by the court with a decree that would free him from his marital relation, but demanded such a finding.

Conceding, for present purposes, that there was no lack of jurisdiction in so far as the plaintiff is concerned, and that the Nevada decree conformed in all particulars to the constitution and laws of that State, is it necessarily enforceable in this State? Fortunately that is not a new question. It arose in Haddock v. Haddock, 201 U. S. 562 (26 Sup. Ct. 525, 50 L. ed. 867). In that case the husband and wife were residing in the State of New York. The husband went into the State of Connecticut, established a residence there, and obtained a decree of divorce. The validity of that decree became pivotal in determining property rights. Chief Justice White said: "A suit for divorce brought in a State other than that of domicile of matrimony, against a wife who is still domiciled therein, is not a proceeding in rem justifying the court to enter a decree as to the res, or marriage relation, entitled to be enforced outside of the territorial jurisdiction of the court. . . A personal judgment against a non resident—not a proceeding in rem—based merely upon constructive service, and therefore jurisdiction not being acquired over the defendant's person, may not be enforced in another State under the full faith and credit clause. Pennoyer v. Neff, 95 U. S. 714 [24 L. ed. 565]." It should be noticed at this point that in the Haddock case the husband had in *good faith* acquired a domicile in Connecticut, and his decree of divorce was in

all respects in accordance with the Connecticut laws. In that case the full faith and credit clause of the constitution of the United States was invoked. The court, after elaborate discussion and citation of many authorities, concluded the opinion as follows: "Without questioning the power of the State of Connecticut to enforce within its own borders the decree of divorce which is here in issue, and without intimating a doubt as to the power of the State of New York to give to a decree of that character rendered in Connecticut, within the borders of the State of New York and as to its own citizens, such efficacy as it may be entitled to in view of the public policy of that State, we hold that the decree of the court of Connecticut, rendered under the circumstances stated, was not entitled to obligatory enforcement in the State of New York by virtue of the full faith and credit clause." And it was also said: "Where the domicil of a matrimony is in a particular State, and the husband, abandoning the wife, wrongfully goes into another State in order to avoid his marital obligation, such other State does not become a new domicil of matrimony, nor the actual or constructive domicil of the wife. That continues in the original State until she actually acquires a new one."

It seems to us that the court, in that case, pronounced sound law and sound public policy. We take it that in the paragraph quoted the statement that a divorce suit "is not a proceeding in rem justifying the court," etc., means that it is not strictly a proceeding in rem. However, this State recognizes a suit affecting the marital status to be a suit quasi in rem. In *Joyner* v. *Joyner*, 131 *Ga.* 217, 223 (62 S. E. 182, 18 L. R. A. (N. S.) 647, 137 Am. St. R. 220), Mr. Justice Beck, in an elaborate opinion dealt with the question, where the residence in another State was conceded to be bona fide. The Haddock case was followed, with liberal quotations therefrom, as well as from other authorities. The court said: "A proceeding for divorce partakes of 'the nature of proceedings in rem rather than of proceedings in personam, the res being the status. . . At the same time these causes can not be said to be altogether proceedings in rem. There is a personal element that enters into them, not found in suits instituted merely to subject or affect property. . . It results therefore that these causes constitute in some measure a dividing line between proceedings strictly in rem and proceedings strictly in personam, partaking

in part of the nature of each, the former however predominating. Hence they are often very properly denominated proceedings quasi in rem.' Minor on Conflict of Laws, 191. 'Accurately speaking, a proceeding in rem is a proceeding against tangible property, and actual notice is dispensed with on the theory that the owner is bound to know where his property is and what is being done with it. It is manifest this theory can not be applied to the relation of husband and wife.' Doughty v. Doughty, 27 N. J. Eq. 315."

Accordingly this court holds that the Reno, Nevada, decree, under the facts disclosed, rendered as it was without being based on personal service of the process on the wife, was without personal jurisdiction over her, and is not entitled to enforcement in this State by virtue of the full faith and credit clause of the Federal constitution. We have not overlooked the fact that there was a physical service or pretended service in the case on Mrs. Cochran in Murray County, Georgia, but of course this constituted no personal service whatever. *Underwood* v. *Underwood,* 142 *Ga.* 441 (83 S. E. 208, L. R. A. 1915B, 674). The Haddock case has been frequently cited, a few of the cases being Toncray v. Toncray, 123 Tenn. 491, 493 (Ann. Cas. 1912C, 284, 34 L. R. A. (N. S.) 1106, 131 S. W. 980) ; Walker v. Walker, 125 Md. 663 (Ann. Cas. 1916B, 934, 94 Atl. 351) ; State of South Carolina v. Westmoreland, 76 S. C. 149 (8 L. R. A. (N. S.) 842, 56 S. E. 674) ; Lister v. Lister, 86 N. J. Eq. 38 (97 Atl. 174) ; Blondin v. Brooks, 83 Vt. 472 (76 Atl. 184).

There is no basis in law or morals on which a divorce decree rendered in Nevada on the application of one spouse, the other remaining in the matrimonial domicile of Georgia, and where the plaintiff merely remained physically in that jurisdiction for a term of six weeks, can be recognized in this State on the constitutional doctrine of full faith and credit or on principles of the comity of states. The judge of the superior court in the present case, on the facts before him, being authorized to find that the husband had not acquired a bona fide domicile in Nevada, and having so found, necessarily treated the Nevada decree as a mere nullity. In De Bouchel v. Candler, 296 Fed. 482, Judge Sibley, of the Northern District of Georgia, dealt with a Nevada divorce decree under very similar facts. In that case, as in this, the defendant had actual notice of the pendency of the divorce∙suit. The jurisdiction of

the Nevada court rested on the plaintiff's residence in Nevada for six months before the suit. She and her husband formerly resided in Louisiana, and separated there. He remained in that State, while she went to Reno, where she remained actually present continuously for six months before suing for divorce. In a suit instituted in the Federal court in Georgia, for the purpose of recovering damages for breach of promise to marry, the Nevada divorce decree was attacked. The defendant insisted that it was a nullity, because the plaintiff in the suit had not established a bona fide domicile in Nevada. Among other principles ruled in that case by Judge Sibley is the following: "A State in which an applicant for divorce is a mere sojourner, in which the other party is not domiciled, has no jurisdiction to grant a decree on substituted service, but is a mere meddler; and such a decree, even though authorized by its own laws, is not entitled to full faith and credit elsewhere as a matter of right, and should not be recognized by comity, because directly tending to overthrow the power of every State to deal with the matrimonial status of its own citizens. Actual domicile of one party or the other in the State in which a decree of divorce is granted being essential to the jurisdiction to make it, whether such domicile in fact exists may be collaterally inquired into when the decree is sought to be used in another State; and if it clearly appears that such domicile was lacking, the decree will be treated as a nullity, and the status of the parties unaffected thereby." See the collection of authorities cited in that case.

There is no obligation on the part of one state to recognize a judgment rendered in another that originated in a fraudulent intention maintained and carried out on the same basis. We thoroughly approve what was said by Stevenson, V. C., in Lister v. Lister, supra: "The authorities, I think, all sustain the proposition that there is no principle of comity which interferes with the power of the State of New Jersey, in accordance with its well-settled law, to deny the right of any court in Nevada to determine the status of the defendant in this case in respect of marriage, or to decree that he is an unmarried man, unless he ceased to be a bona fide resident of New Jersey and became a bona fide resident of Nevada. . . I have found as a matter of fact that the defendant did not lose his residence in New Jersey—never became a bona

fide resident of Nevada—and that he committed a fraud upon the laws of New Jersey, and also the laws of Nevada." The six-weeks "residence" statute affords no benefit to the bona fide citizens of Nevada. They did not need it. A six-weeks "residence" is of advantage only to those who do not wish to incur any obligations to the State, such as are borne by citizens generally. In this case Cochran contributed, it may be assumed, to the business, and therefore the support, of the court officials, the attorneys, boarding-house keepers, and, according to his own testimony, to the gamblers. But he performed no labor, public or private, engaged in no business, and was of no real benefit to the State of Nevada. To sanction such a fraud is not compatible with due regard for the public policy and laws of this State, both of which stand for the sanctity of the marriage status and therefore of the domestic establishment. The judgment of which complaint is made was not erroneous. *Judgment affirmed. All the Justices concur.*

ATKINSON and HINES, JJ., concurring specially. We concur in the result reached in this case, because under the facts in the record the court of Nevada did not have jurisdiction of the cause, the defendant not having been a bona fide resident of that State as required by statute; and therefore the judgment rendered was void for lack of jurisdiction.

NOTE BY THE COURT. Since the rendition of the above judgment, Michigan Law Review, Vol. 30, No. 2, December, 1931, has been received. On p. 285 thereof appear comments upon Fischer v. Fischer, 254 N. Y. 463, 173 N. E. 680. Our decision was in thorough harmony with that, a very similar case. In the Review just mentioned there is a pertinent discussion with numerous citations which are deemed of sufficient value to authorize the placing of the same here, in the nature of an annotation.